BECKWITH, Associate Judge,
concurring in part and dissenting in part:
No witness ever identified Alazajuan Gray as one of the men who robbed Katherine Takai, and innumerable young black men on the Metro that day would have shared the traits that Mr. Gray himself shared only roughly with Ms. Takai’s description of the robbers. I am unwilling to conclude that the additional evidence that Mr. Gray was hanging out with—and causing trouble with—one of the other robbers an hour later and miles away from the Takai robbery and that Mr. Gray a week earlier committed a very different kind of robbery with this other robber renders the evidence sufficient to support his conviction. So while I join the court’s opinion in every other respect, I dissent from its holding that the evidence was sufficient to convict Mr. Gray of robbing Ms. Takai on September 28, 2012.
Review for sufficiency of the evidence “is deferential, but it is not a rubber stamp.” Swinton v. United States, 902 A.2d 772, 776 n.6 (D.C. 2006). As this court has explained, “[p]roof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review .... ” Rivas v. United States, 783 A.2d 125, 134 (D.C. 2001) (en *811 banc). We therefore have an obligation to decide whether the evidence is “strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt.” Id.
While a reasonable jury could have found beyond a reasonable doubt that Mr. Gray’s codefendant, Clifton Smith, robbed Ms. Takai,[1] the evidence connecting Mr. Gray to the crime was significantly weaker. It consisted only of (1) Mr. Gray’s partial match to Ms. Takai’s vague description of one of the three people who robbed her, (2) Mr. Gray’s admission that he passed through the busy Gallery Place transfer station on the night of the robbery, and (3) Mr. Gray’s association with Mr. Smith - and participation with Mr. Smith in other criminal activity on the night of the robbery and a week earlier.
Ms. Takai described the people who robbed her at the Gallery Place station as three young black men.[2] One of the men— who, based on other evidence offered at trial, was likely Mr. Smith—had dreadlocks and a dark complexion and “was dressed informally” in a white T-shirt. The other two men had “shorter hair” and were wearing “[djarker clothes.” Ms. Takai later clarified that one of these two men was wearing a light blue shirt, “not [a] dark blue” shirt. The man in the light blue shirt “was a little bit taller than [she was], and he was about average height.” Ms. Takai testified that none of the three men was wearing a hat. When Mr. Gray was arrested about an hour later at a bus stop near the Fort Totten station, he was “wearing a ... dark blue hat, yellow rim around the hat, and a dark blue shirt.”[3] Ms. Takai was later shown photographs of Mr. Gray and Mr. Smith but was unable to identify them as the people who robbed her and did not identify them at trial.
Ms. Takai’s description alone—of a young black man of average height, with short hair and a light blue shirt—could have applied to any number of people and was plainly insufficient to link Mr. Gray to the robbery. And Mr. Gray only imperfectly matched this vague description. At the time of his arrest, Mr. Gray was wearing a dark blue shirt, not the light blue shirt described by Ms. Takai,[4] and he was wearing a hat, unlike the robbers Ms. Takai described.[5] Ms. Takai’s description would not have provided probable cause for an arrest or reasonable suspicion for an investigatory stop. See In re T.L.L., 729 A.2d 334, 340 (D.C. 1999) (holding that the de *812 scription of robbers as “two ... black teenagers wearing dark clothing,” one with “a ‘dark’ complexion, the other a ‘medium’ complexion,’” was “altogether lacking in particularity” and thus insufficient to justify an investigatory stop); see also McFerguson v. United States, 770 A.2d 66, 74 n.13 (D.C. 2001) (collecting Fourth. Amendment cases involving vague suspect descriptions). It is hard to see, then, how a reasonable, jury could have relied on Ms. Takai’s description to find beyond a reasonable doubt that Mr. Gray participated in her robbery. See Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (“[T]he minimum evidence to establish probable cause ... may fall far short of the amount necessary to support a criminal conviction.”); see also Paret-Ruiz v. United States, 827 F.3d 167, 179 (1st Cir. 2016) (explaining that the sufficiency of the evidence standard requires “a higher degree of certainty than the probable cause standard”); State v. Suddith, 379 Md. 425, 842 A.2d 716, 726 (2004); Commonwealth v. Collado, 426 Mass. 675, 690 N.E.2d 424, 428 n.8 (1998); State v. Williams, 205 Conn. 456, 534 A.2d 230, 240 (1987); State v. Hussong, 739 N.W.2d 922, 928 (Minn. Ct. App. 2007). Ms. Takai’s failure to identify Mr. Gray further undermines whatever minimal probative force is provided by the partial match between Ms. Takai’s vague description and Mr. Gray’s appearance.
The government’s other evidence • against Mr. Gray adds little to the picture. First, there is evidence that Mr. Gray passed through the Gallery Place station on the night of Ms. Takai’s robbery. But given that Gallery Place is a busy transfer station connected to the Fort Totten station by the yellow, green, and red lines, this evidence does not meaningfully bolster what can already be inferred from the fact that Mr. Gray was later seen at the Fort Totten station.
Second, there is surveillance footage from the Fort Totten Metro station and testimony showing that Mr. Gray and Mr. Smith were together at the Fort Totten station about an hour after Ms. Takai was robbed. The footage and testimony show that Mr..Gray and Mr. Smith encountered Gerald McIntosh at the Fort Totten station, chased him when he tried to flee, and attacked him for “snitching.” In addition to establishing that Mr. Gray and Mr. Smith were together for at least part of the evening on September 28,[6] the surveillance footage and testimony support an inference that they were friends who were willing to engage in risky and possibly illegal behavior with each other. In these respects, the surveillance footage and related testimony give rise to an identity inference that Mr. Gray was the individual who worked with Mr. Smith and the third unknown man to rob Ms. Takai. See Johnson v. United States, 683 A.2d 1087, 1093 n.4 (D.C. 1,996) (en banc). But this inference is worth very little, given that an hour passed between the two incidents and the later incident occurred at a different Metro station, miles away. September 28 was a Friday night, and surveillance footage from the Fort Totten station shows Mr. Smith socializing with at least three individuals—only one of whom was possibly Mr. Gray.
The evidence from the Fort Totten station has little further probative value. It is not probative of “motive, intent, common plan, ... or absence of mistake or accident,” the other four categories (besides “identity”) under which bad acts evidence *813 is typically admissible. Jones v. United States, 127 A.3d 1173, 1184 (D.C. 2015); see also Drew v. United States, 331 F.2d 85, 90 (D.C. Cir. 1964). Indeed, there is no apparent connection between the encounter with Mr. McIntosh and the robbery of Ms, Ta-kai, and the two episodes are not similar in any way, except that they both allegedly involved Mr. Smith and Mr. Gray and occurred on the same night.
Third, as the court explains in the majority opinion, there is significant evidence that Mr. Gray and Mr. Smith robbed Mr. McIntosh on September' 21. Ante at 796. Although the evidence of the September 21 robbery of Mr. McIntosh would be excluded in a retrial of the September 28 robbery of Ms. Takai, the court is required to consider it in its sufficiency analysis. See Lockhart v. Nelson, 488 U.S. 33, 40-41, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). But as the court explains, this evidence is of negligible probative value on the issue of identity, given the dissimilarity between the two crimes. See ante at 799-801. Most significantly, the McIntosh robbery “was armed, accomplished through intimidation,” while the Takai robbery “was unarmed, accomplished through stealthy snatching.” Ante at 800. Indeed, as the court.notes, the prosecutor even told the trial court that it did not intend to use the evidence of the September 21 robbery to prove the identity of Ms. Takai’s robbers. Ante at 800. At most, the evidence of the September 21 robbery, like the evidence of the September 28 McIntosh assault, gives rise to an inference that Mr. Gray and Mr. Smith were friends who were willing to participate in risky and illegal activity together.
The weak inferences summarized above that can be drawn from the evidence of the September 21 robbery and the September 28 assault can scarcely compensate for the mismatch between Mr. Gray’s appearance and Ms. Takai’s vague description of the robber in the light blue shirt-r-let alone Ms. Takai’s inability to identify Mr. Gray as one of the robbers. To the extent that the majority is able to squeeze any further probative value out of the evidence of the September 21 robbery and the September 28 assault, it must be drawing a propensity inference, notwithstanding its denial that it is doing so. Ante at 806 n.14; see Holmes v. United States, 580 A.2d 1259, 1268 (D.C. 1990) (“Evidence designed to show that [defendants] had a criminally-oriented relationship with one another is not so very different from proof that [they] were predisposed to commit crimes together .... ”).
Our case law does not allow the government to prove guilt through evidence of a defendant’s criminal propensity, see Johnson, 683 A.2 at 1101; Drew, 331 F.2d at 88,[7] and a reasonable jury' could not rely *814 on a propensity inference in reaching a verdict. Moreover, although Lockhart requires appellate courts to consider even improperly admitted evidence when conducting á sufficiency analysis, 488 U.S. at 40-41, 109 S.Ct. 285, nothing in Lockhart compels appellate courts to draw improper inferences from evidence admitted, properly or improperly, at trial. Accordingly, Lockhart cannot justify the . majority’s drawing an improper propensity inference from the surveillance footage and testimony.
It is particularly inappropriate for the court to rely on a propensity inference where, as here, such an inference would be at odds with the trial court’s instructions to the jury. In the preliminary instructions, the trial court gave an instruction similar to Criminal Jury Instructions for the District of Columbia, No. 2.404 (5th ed. rev. 2012):
Each defendant is entitled to have the issue of his guilt as to each of the crimes for which he is on trial determined from his own conduct and from the evidence that applies to him, as if he were being tried alone. You should therefore consider separately each offense and the evidence which applies to it, and you should return separate verdicts as to each charge, as to each defendant, unless I instruct you to do otherwise. The fact that you may find one defendant guilty or not guilty on one charge should not influence your' verdict with respect to any other charge for that defendant. Nor should it influence your verdict with respect to the other defendant as to that same charge or any other charge.
A similar instruction, patterned on Criminal Jury- Instructions for the District of Columbia, No. 2.403 (5th ed. rev. 2012), was included in- the final instructions. Only by disregarding these instructions could the jury have drawn a propensity inference from Mr. Gray and Mr. Smith’s harassment and assault of Mr. McIntosh. A reasonable jury could not have disregarded these instructions, see Jordan v. United States, 18 A.3d 703, 709 (D.C. 2011) (“[J]u-rors are presumed to follow the trial court’s instructions_”), and neither can we in deciding whether sufficient evidence supports Mr. Gray’s conviction, cf. Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining, in the civil context, that “it makes no sense” to talk about what conclusions a reasonable jury could reach “without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall”). In sum, the court’s apparent reliance on a propensity inference in rejecting Mr. Gray’s sufficiency claim is unjustified by Lockhart and contrary to law.
This court’s decision in Smith v. United States, 561 A.2d 468 (D.C. 1989), provides strong authority on a very similar fact pattern that the evidence here is insufficient. In Smith, two defendants, Darryl Harris and Michael Smith, were alleged to have committed three robberies over a period of a few hours. Id. at 469-70. The victim of one of the robberies, Ms. Adami, described the robbers as “two black men,” one with a “short brown leather coat” and the other with a “light-colored cream coat.” Id. at 469. Ms. Adami testified that the men pushed her as she was leaving a building, and she then noticed that her wallet had been taken from her shoulder bag. Id. She confronted the two men, but they denied taking her wallet and walked away “briskly.” Id. Still photographs from a surveillance camera in the building’s lobby corroborated Ms. Adami’s account, *815 showing a man “wearing a tan trencheoat draped over his shoulders and a dark-colored hat” and another man “wearing a waist-length dark-colored jacket.” Id. The stills were “extremely blurry,” however, “rendering identification of the attire or facial characteristics of the individuals ... impossible.” Id. at 470. Mr. Harris and Mr. Smith were arrested several hours later, after committing the other two robberies. Id. at 470. At the time of arrest, Mr. Harris was wearing, among other things, a “tan trencheoat draped over his shoulder[ and] a dark-colored beret,” and Mr. Smith was wearing “a brown waist-length leather jacket.” Id. Ms. Adami was not able to identify Mr. Harris or Mr. Smith as the robbers, but Mr. Harris confessed to the robbery. Id. at 469, 471. In a joint’trial, the two men were convicted of committing two of the three robberies, including the one involving Ms. Adami.[8] Id. at 469.
This court reversed Mr. Smith’s conviction for the Adami robbery on sufficiency grounds. Id. at 472. The court relied on the fact that Ms. Adami could not identify either man and that the surveillance stills were too fuzzy to permit identification. Id. Given that in the present case Ms. Takai was similarly unable to identify the people who robbed her, and given that, as was the case with Michael Smith in Smith, there is little other evidence connecting Mr. Gray to the robbery, the evidence supporting Mr. Gray’s robbery conviction is likewise insufficient. This conclusion is strengthened by the fact that Ms. Adami’s description of her assailants in Smith, as bolstered by the admittedly fuzzy surveillance stills, was less generic than Ms. Takai’s description of her robbers,, and yet was still held to be insufficient.
The court in Smith apparently also deemed it inappropriate to consider the fact that Mr. Smith committed at least one other robbery with Mr. Harris—or considered this fact to be of little probative significance: it made no mention of the other robbery in its sufficiency analysis of the Adami robbery. See id. at 472.[9] The court in the present case should similarly refrain from drawing improper propensity inferences about Mr. Gray from the evidence about Mr. Smith and Mr. Gray’s other bad acts.
For these reasons, and under our precedent in Smith, the government’s evidence in support of Mr. Gray’s conviction for the robbery of Ms. Takai is insufficient.[10] A *816 reasonable jury—particularly one that is not relying on an improper propensity inference—could not conclude beyond a reasonable doubt that Mr. Gray is guilty of the robbery. Accordingly, I would hold that the Double Jeopardy Clause bars a retrial of Mr. Gray’s September- 28 robbery charge.

. Not only did Mr. Smith match Ms. Takai's description of one of the three people who stole her cellphone, but Mr. Smith also admitted that he possessed Ms. Takai's phone on the night of the robbery, and the phone was later recovered at the location where Mr. Smith was arrested.

. Ms. Takai testified that the men were "about [her] age.” Ms. Takai further testified that she was twenty-five years old at the time of the trial, which was held less than a year after the robbery. According to court documents, Mr. Gray was nineteen years old at the time of the robbery, although no mention of Mr. Gray’s age was made at trial.

. The surveillance footage from the Fort Tot-ten station shows Mr. Smith with at least three other people, including two companions with dark-colored shirts.

. Mr. Gray was perhaps a closer match to the other young black man with short hair whom Ms. Takai simply described as wearing "darker clothes.” But this description is even more general than Ms. Takai’s description of the man in the light blue shirt, and the match thus has little probative force.

. Mr. Gray also offered evidence at trial that he had tattoos on his arm and neck. Ms. Takai did not describe any of the three robbers as having tattoos. Given that none of the government’s other witnesses remembered Mr. Gray having tattoos, a reasonable jury could have decided not to credit Mr. Gray's tattoo evidence or to give it little weight.

. Mr. Gray and Mr. Smith also both admitted at trial that they were together on September 28.

. In addition to violating our rules of evidence, the use of bad acts evidence to establish guilt based on the defendant's criminal propensity "is contrary to firmly established principles of Anglo-American jurisprudence.” McKinney v. Rees, 993 F,2d 1378, 1380-81 (9th Cir. 1993); see also Michelson v. United States, 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant’s evil character to establish a probability of his guilt.”). Propensity and character evidence prejudices a defendant by "denying] him a fair opportunity to defend against [the] particular charge.” Michelson, 335 U.S. at 476, 69 S.Ct. 213; accord, Old Chief v. United States, 519 U.S. 172, 181-82, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). And while the Supreme Court has not decided the question, it is at least arguable that the Due Process Clause is implicated when the factfinder relies on improper inferences of “criminal disposition” in finding a defendant guilty. Spencer v. Texas, 385 U.S. 554, 572-74, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); see also Estelle v. McGuire, 502 U.S. 62, 75 n.5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Sims v. Stinson, 101 F.Supp.2d 187, 195-96 (S.D.N.Y. 2000) (holding that the admission of improper propensity *814 evidence violates due process if there is a reasonable probability that the evidence affected the verdict), aff'd, 8 Fed.Appx. 14 (2d Cir. 2001).

. Mr. Harris was only charged with two of the robberies. Mr. Smith was charged with all three but was acquitted on one of the counts. Smith, 561 A.2d at 469.

. Judge Steadman highlighted this evidence in his partial dissent in the case. See Smith, 561 A.2d at 475 (Steadman, J., concurring in part and dissenting in part) (“[T]he jury could properly have found Smith to have been a proven confederate of Harris in [one of the other three robberies], Harris by his own admission participated in both the [other robbery] and [the] Adami robber[y] _”). The court nevertheless declined to rely on it.

. See also United States v. Bonner, 648 F,3d 209 (4th Cir. 2011) (holding that the evidence that the defendant committed an armed robbery was insufficient where the defendant’s girlfriend’s vehicle was seen leaving the scene of the crime; a search of the vehicle revealed, among other things, ammunition and the defendant’s identification card, wallet, and cell phone; a Yankees hat containing the defendant's and others’ DNA was found at the scene; and the victims described one of the robbers as an "African American male” wearing a Yankees hat, but could not identify the’ defendant, who was an African American); Christopher v. State, 82 So.3d 1238, 1239 (La. 2012) (same where "the victim ... could not positively identify his assailant and gave a description at odds with [the defendant’s] appearance and with the descriptions of their assailant provided by the ... victims’’ of other armed robberies of which the defendant was convicted, and where this robbery was separated in time from the other robberies); State v. Walker, 322 N.J.Super. 535, 731 A.2d 545, 550-51 (1999) (same where the victim could *816 not identify the defendant in court and said only that a photograph of the defendant "looked like” the robber and where the victim could not remember the details of the car that the robber drove).